ORDERED.

**Dated:  October 17, 2017**

Catherine M^c Ewen
_____
Catherine Peek McEwen
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

In re:

MATTHEW L. FESHBACH and                     Case No. 08:11-bk-12770-CPM
KATHLEEN M. FESHBACH,

    Debtors.
_____/

MATTHEW L. FESHBACH and                     Case No. 08:11-ap-00803-CPM
KATHLEEN M. FESHBACH,

    Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
TREASURY and INTERNAL REVENUE
SERVICE,

    Defendants.
_____/

**AMENDED[1] MEMORANDUM DECISION ON
COMPLAINT TO DETERMINE DISCHARGEABILITY
OF DEBT FOR TAXES AND TO SET ASIDE TAX LIENS**

---

[1] Amended to correct a footnote citation and some citation conventions, add an inadvertently omitted fact finding (based on a stipulated fact), correct scrivener's errors, and make stylistic changes for purposes of publication.

In providing an exception to a discharge in bankruptcy for debtors who do not "make an honest and reasonable effort to comply with the tax laws,"[2] the Bankruptcy Code evinces public policy favoring payment of taxes.  The Plaintiffs in this proceeding are Matthew L. and Kathleen M. Feshbach, chapter 7 debtors. They seek a determination that their chapter 7 discharge extends to their substantial 2001 federal income tax debt.  But their alleged inability to pay this debt resulted from a conscious decision to spend their considerable income to support an excessive lifestyle based on a conviction that it takes money to make money.  While such a conviction may in some instances prove true, it cannot excuse the Plaintiffs' intentional failure over the course of more than a decade to pay their tax debt while at the same time realizing in excess of $21 million in income ($13 million of that from tax years 2002-2010) and living what most would consider a luxurious life.  Consequently, they are not entitled to a discharge of any of their tax debt.

## <u>Jurisdiction</u>

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and the Standing Order of Reference issued by the United States District Court for the Middle District of Florida.  This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(I) and procedurally governed by Rule 4007, Federal Rules of Bankruptcy Procedure.

The Feshbachs filed their dischargeability complaint against United States of America, naming the United States Department of Treasury and the Internal Revenue Service (the "IRS" or "Service") as Defendants and seeking a determination of the dischargeability of substantial federal income tax liability and the avoidance of tax liens.[3]  After an unsuccessful run at a summary judgment, the Feshbachs proceeded to trial on the complaint.

---

[2] *Justice v. U.S. (In re Justice)*, 817 F.3d 738, 746 (11th Cir. 2016).

[3] Adv. Doc. No. 1.

### Discussion

### *I. Facts*

For most of his adult life, Mr. Feshbach has worked as an investment professional, both as a money manager and a private investor.[4]  But he hasn't gone at it alone.  Essentially since they married, Mrs. Feshbach has been, in her words, an extension of Mr. Feshbach's professional ventures, albeit at their home.[5]  Beginning in the 1980s, Mr. Feshbach began using an investment strategy known as "selling short against the box."  This strategy served one primary purpose: delaying the recognition of taxable income. And unlike selling short generally—which involves an investor's selling stock that he (or a broker on his behalf) borrows from another with the hope that the stock price will fall before the investor is required to buy identical stock to return to the person whose stock the investor sold—selling short against the box is in one way a far safer bet.

An investor who sells short against the box borrows matching shares of an appreciated stock that the investor presently owns.  The investor then sells the borrowed shares and posts the owned shares as collateral, thereby creating a long and short position in the same security. (Days long ago, the investor would place the owned, collateralized shares in a safe-deposit box—hence the phrase "against the box."[6]) This maneuver creates a neutral position, whereby any change in one position is always offset by an opposite, but balanced, change in the other position. "You can't lose; you can't win," Mr. Feshbach explained.[7] And here's the upside: selling short against the box locks in the built-in gain on the owned shares. Of course, an investor could similarly

---

[4] Adv. Doc. No. 154 at 60:7-9.

[5] Adv. Doc. No. 155 at 128:18-22.

[6] S.K. SINGH, BANK REGULATIONS 121 (2009).

[7] Adv. Doc. No. 154 at 85:4.

capture the same gain by merely selling the owned shares. But that would create taxable income. Selling short against the box, on the other hand, at one time allowed investors to liquidate stock without having to report the gain as income, often delaying the taxable event until the subsequent tax year—or even longer.

Although it is unclear exactly how much money Mr. Feshbach made in the 1980s and 1990s by selling short against the box, one thing is certain: Mr. Feshbach was a successful investment professional.  This success allowed him and his family to lead an unusually comfortable life.  But it is important to note that Mr. Feshbach did not support the family through traditional means.  Instead, Mr. Feshbach borrowed against the gains that he locked in by selling short against the box.[8]  In the first part of the 1990s, Mr. Feshbach invested a significant portion of the borrowed funds in real property, spending $14 million to construct a new house on a parcel of land that he purchased near Silicon Valley.[9]

Because selling short against the box allowed investors to defer gain recognition, Mr. Feshbach was not required to immediately pay taxes on the borrowed funds.  He could defer that obligation until he returned the borrowed stock or closed the short position. This, no doubt, was the peril of selling short against the box.  An imprudent or unlucky investor who years ago borrowed locked-in gains for other investments could find himself empty handed when the tax bill came due.

New legislation made things even more complicated for investors who sold short against the box.  In his 1997 budget proposal, President Bill Clinton, who was poised to "to kill 'selling short against the box' and similar strategies to lock in gains while deferring or even eliminating

---

[8] Adv. Doc. No. 154 at 85:16-25, 86:19-25, 87:1-4.

[9] Adv. Doc. No. 158 at 87: 8-19.

taxes,"[10] suggested several amendments to the Internal Revenue Code. Congress agreed with the proposed changes and subsequently enacted the Taxpayer Relief Act of 1997,[11] adding (among other things) § 1259 to Title 26. This new provision, titled "Constructive sales treatment for appreciated financial positions," closed the loophole that made selling short against the box so appealing.  Under the provision, still in effect today, a taxpayer is treated "as having made a constructive sale of an appreciated financial position [when] the taxpayer . . . enters into a short sale of the same or substantially identical property."[12]  And where "there is a constructive sale of an appreciated financial position," taxpayers are required to "recognize gain as if such position were sold."[13]

But this legislative fix favoring the federal government's coffers did not deter Mr. Feshbach from this investment strategy.  He "embraced volatility and . . . believed [that he] was smarter than the market."[14] In 1999, Mr. Feshbach heavily invested in a home improvement and remodeling company, again selling short against the box.[15]  In relatively quick order, the company collapsed and entered bankruptcy.[16]  This event, under the new tax laws, closed out Mr. Feshbach's investments in the company and triggered significant income recognition, on which he owed $1,950,827.00 in taxes.[17]  At that time, the Feshbachs did not have sufficient liquid

---

[10] Simon D. Ulcickas, *Internal Revenue Code Section 1259: A Legitimate Foundation for Taxing Short Sales Against the Box or A Mere Makeover?*, 39 WM. & MARY L. REV. 1355, 1367 (1998) (quoting *Tax Report: A Securities-Industry Group Defends Investor Techniques Under Assault*, WALL ST. J., Feb. 12, 1997, at A1.).

[11] Taxpayer Relief Act of 1997, PL 105–34, August 5, 1997, 111 Stat 788.

[12] 26 U.S.C. § 1259(c)(1)(A).

[13] *Id.* at § 1259(a)(1).

[14] Adv. Doc. No. 154 at 136:10-11.

[15] *Id.* at 89:4-11.

[16] *Id.* at 89:12-16.

[17] Adv. Doc. No. 149 at ¶ 2.

assets to cover the debt.   Luckily, Mr. Feshbach still had a strong securities portfolio.   So in 2001, he liquidated other short-against-the-box positions to help cover the 1999 tax debt.[18] Unsurprisingly, this again triggered income recognition.   This time the stakes were higher.   On their 2001 tax return, the Feshbachs reported $8,601,748.00 in taxable income.[19]   This resulted in a $3,247,839.00 tax liability.[20]   Things looked bleak for the Feshbachs.   Changing circumstances and bad bets left them deeply indebted to the federal government.

Faced with this mounting problem, the Feshbachs approached the IRS with a plan to settle the 1999 and 2001 tax debts for less than what they owed.   This is known as an "offer-in-compromise."[21]   In deciding on whether to accept any given offer—evidently, an altogether complex process—the IRS considers what it refers to as a taxpayer's "reasonable collection potential," which is a function of two things: (1) a taxpayer's assets and (2) a taxpayer's ability to pay (a calculation that is essentially a taxpayer's monthly income reduced by reasonable expenses).[22]   According to a revenue officer[23] who, for a period of time, handled the Feshbachs' case, "the government is allowed to take less than full payment of the tax, penalty, and interest due if it's in the interest of the government and the taxpayer [and] if the taxpayer is going to offer

---

[18] Adv. Doc. No. 154 at 146:10-17.

[19] Def.'s Ex. No. 3.

[20] *Id.*

[21] *See* 26 U.S.C. § 7122(a) ("The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense.").

[22] Adv. Doc. No. 154 at 200:10-201:4.

[23] For ease of reference, the Court will use the term "revenue officer" for all IRS employees who at any time handled the Feshbachs' case, while acknowledging that some of the IRS employees who handled the case held positions other than revenue officer.

[his] equity in assets and a portion of his future ability to pay."[24]   The Service also takes into account whether accepting a particular offer would "be unfair to the taxpaying public at large."[25]

The Feshbachs presented their first offer-in-compromise in June 2001, proposing to settle the 1999 tax debt for $1 million, paid over the course of five years.[26]   At the time, taking accrued interest and penalties into account, the Feshbachs' $1 million offer represented roughly half of what they owed on the 1999 tax debt.  Two months later, generally consistent with the offer, the Feshbachs submitted an initial $200,000.00 payment to the IRS.[27]   Nevertheless, after an initial review, the Service simply didn't feel that the Feshbachs' half-price offer was the right price, in part because the documents that the Feshbachs' submitted along with this first offer established that the Feshbachs were living "way over allowable living expenses" and that Mr. Feshbach personally believed that his income would continue to rise in the coming years.[28]   The Service believed the Feshbachs' offer to be a "nonstarter," primarily because their reasonable collection potential exceeded their entire tax debt.[29]   But before the Service could relay this decision, the Feshbachs, in December 2001, withdrew their offer-in-compromise and proposed a temporary agreement, which the Service accepted.[30]   Under the terms of the temporary agreement, the Feshbachs agreed to make voluntary $1,000.00 monthly payments on the 1999 tax debt, to sell

---

[24] Adv. Doc. No. 154 at 200:3-7.

[25] *Id.* at 200:8-9.

[26] Adv. Doc. No. 149 at ¶ 15. The precise terms were $200,000 by the end of July 2001, $300,000 on the sale of their home, and the balance over five years.

[27] *Id.* at ¶ 4.

[28] *Id.* at ¶¶ 22-23.

[29] Adv. Doc. No. 155 at 178:12-179:1.

[30] Adv. Doc. No. 149 at ¶¶ 25-26.

their principal residence, which was located in Belleair, Florida, and to reduce their standard of living.[31]  In exchange, the IRS agreed to temporarily suspend all collection efforts.[32]

Over the following months, Mr. Feshbach created an investment fund, MLF Investments, LLC ("MLFI"), through which he aimed to trade on behalf of "ultra-high-net-worth people."[33] Evidently he accomplished this goal. Some of MLFI's eventual clients were worth hundreds of millions and even billions of dollars.[34]  According to Mr. Feshbach, the principal purpose driving the decision to run a larger investment fund—as compared to merely investing his own money—was to enable the Feshbachs to significantly increase their income and to thereby contribute more to their tax payments.

Nine or so months into the temporary agreement, in September 2002 and seemingly before MLFI could even take off, the Feshbachs proposed another offer-in-compromise. This time, the offer aimed to settle both the 1999 and 2001 tax debts. Yet, this second offer was only marginally higher in dollar amount than the first and lower as a percentage of their total tax liability than the first.  At a point when they owed more than $6 million to the federal government, the Feshbachs offered to settle their total tax debt for $1.25 million.[35]  Notably, the Feshbachs had not yet sold their Belleair house, nor had they materially reduced their standard of living—both of which were essential to the Service's decision to enter into the temporary agreement.[36]  Instead, in the Service's opinion, the Feshbachs, "[w]hile paying a token $1,000.00

---

[31] *Id.* at ¶ 25.

[32] Adv. Doc. No. 155 at 179:12-14.

[33] *Id.* at 133:7-8.

[34] *Id.* at 133:8-12.

[35] Adv. Doc. No. 149 at ¶ 28.

[36] Adv. Doc. No. 155 at 181:14-17, 184:1-13, 185:10-20.

monthly to [the] IRS[,] . . . continued to maintain the same lavish lifestyle."[37]    Indeed, the revenue officer who was handling the case at the time concluded "that the entire offer process was a delay by Mr. Feshbach."[38]

Unsurprisingly, the Service remained concerned with the Feshbachs' overall spending and, in the midst of its review of their second offer, explained to them that their excessive expenses could perhaps be justified if such expenses were necessary for the production of income but warned that they could also be considered egregious, particularly when compared to the nominal payments that they were making toward their total tax debt.[39] After a complete review (and an appeal of that review), the Service rejected the Feshbachs' second offer, ultimately concluding that "there was no basis to compromise because the [Feshbachs] had the ability to fully pay the tax liability."[40]

In light of the Service's decision to seek collection of the Feshbachs' entire tax debt, the Feshbachs approached the Service about entering into an installment repayment plan.[41]    In response, the Service made clear that it would approve such an arrangement, if at all, on the 2001 tax debt alone, and only after the Feshbachs fully paid the 1999 tax debt.[42]    Knowing this, the Feshbachs quickly made two $50,000.00 payments on the 1999 tax debt, one in June 2005 and another in the following month.[43]    The Feshbachs then either liquidated some boxed positions or

---

[37] Pls.' Ex. No. 16.

[38] *Id.*

[39] Adv. Doc. No. 149 at ¶ 40.

[40] Adv. Doc. No. 155 at 90:4-12.

[41] Adv. Doc. No. 149 at ¶¶ 43, 57.

[42] *Id.* at ¶ 59.

[43] *Id.* at ¶¶ 61-62,

obtained a $2.7 million unsecured loan, the proceeds of which they handed to the IRS, to cover the balance of the 1999 tax debt.[44]    At that point, as contemplated, the Service approved the Feshbachs' request to repay the 2001 tax debt over time. Unlike the temporary agreement that called for voluntary payments over a one- to two-year period, this installment agreement was permanent and required the Feshbachs to pay $120,000.00 per quarter until their full debt was satisfied.

For ten quarters—from October 2005 through January 2008—the Feshbachs kept up their end of the bargain, paying $1.2 million to the IRS over that time while reporting income of $10,459,762.00 for the years 2005-2007. [45]    They also sold their Belleair house. Unfortunately for the Service and the Feshbachs, this came more than six years after the Feshbachs purportedly dedicated themselves toward liquidating their assets.[46]    Even worse, the sale netted proceeds of only $685,607.00—far less than the amount that the Feshbachs believed a sale would yield.[47]

After that, things fell apart. The economic downturn of 2008 hit, and Mr. Feshbach's health seriously declined, making it difficult for him to get out bed. These two circumstances led to the eventual demise of MLFI, which Mr. Feshbach wound down by 2008.[48]    So in September 2008, eight months removed from their last quarterly payment, the Feshbachs made their third

---

[44] *Id.* at ¶ 70; Adv. Doc. No. 154 at 146:10-17.  Mr. Feshbach stipulated that the IRS Archive Transcript History says that he borrowed the funds, but he testified at trial that he did not borrow the funds to pay off the 1999 tax debt, and that he withdrew the funds from MLFI's capital account.  This iteration of what happened is consistent with his Declaration, Adv. Doc. No. 12 at 17, of which the Court takes judicial notice.

[45] Adv. Doc. No. 149 at ¶ ¶ 73, 80-82.

[46] *Id.* at ¶ 88; Adv. Doc. No. 155 at 184:1-4. The Feshbachs claimed that they needed time to market the Belleair house because of the high list price. The Service supported this rationale, which is precisely why it permitted the Feshbachs one year (not six) to liquidate the Belleair house—and all other assets—without facing collection efforts.

[47] Adv. Doc. No. 155 at 177:22-25.

[48] Adv. Doc. No. 154 at 91:13-18.

and final offer-in-compromise.[49]  At this point, the Feshbachs' debt, all stemming from the 2001 tax year, totaled more than $3.6 million.[50] Nevertheless, the Feshbachs sought to settle it all for $120,000.00, spread out over 48 months.[51]  In June of the following year, 2009, the Service rejected this offer and affirmed the rejection following the Feshbachs' appeal.[52]

With the Feshbachs' having defaulted on the latest installment agreement—and with millions of dollars still unpaid—the Service again restarted collection efforts.  Over the ensuing period, as the Service once again attempted to sort out the Feshbachs' financial situation and to uncover the best way to collect what it was owed, the Feshbachs made roughly 23 payments of $2,500.00 and then 4 payments of $15,000.00.[53]  And then payments ceased, the last coming in May 2011.[54]

On June 23, 2011, a little more than a month after their last payment, the Feshbachs, "disheartened" and "out of gas" in attempting to deal with their tax debt,[55] filed for chapter 7 bankruptcy relief.[56] They received their discharge ten months later.[57]

The Service's continued adherence to accept no less than full satisfaction of the Feshbachs' 2001 unpaid debt was based upon its belief that the Feshbachs had the means to settle the debt in its entirety. These repeated determinations were influenced by a broad look at the

---

[49] Adv. Doc. No. 149 at ¶ 91.

[50] *Id.*

[51] *Id.* at ¶ 92.

[52] *Id.* at ¶¶ 102, 109.

[53] *Id.* at ¶¶ 92, 108, 123, 125-128.

[54] Id. at ¶ 127.

[55] Adv. Doc. No. 154 at 181:22-182:13.

[56] Adv. Doc. No. 149 at ¶ 131.

[57] *Id.* at ¶ 132.

Feshbachs' financial situation over time.[58] One important consideration, of course, was the Feshbachs' income. To be sure, the Feshbachs had significant income in the years that preceded 2001 and, more importantly, in the years that followed. This fact alone might lead a reasonable person to assume that the Feshbachs had the financial wherewithal to confront the unforeseen obstacles that arose in subsequent years.  Yet, they say they didn't.  Nevertheless, not counting the millions of dollars of taxable income that the Feshbachs recognized in between 1999 and 2001—more than $8 million of which came in 2001, which they explain was "phantom" income, in the sense that they did not actually collect that amount of income[59]—the Feshbachs made $13,056,518.00 in the nine years preceding their bankruptcy filing.[60] With this amount of money at their disposal, the Service wondered why the Feshbachs weren't contributing more toward their unpaid taxes.

Another consideration—the more controversial one—was the Feshbachs' overall spending.  Between the first quarter of 2001 and the first quarter of 2010, excluding all tax payments (for 1999, 2001, and all other tax years), the Feshbachs spent more than $8.5 million on personal and household expenses and charitable contributions.[61] Of that $8.5 million, between the first quarter of 2003 and the first quarter of 2010, they spent, for example, $721,809.60 on personal travel, $503,607.83 on clothing, $370,856.24 on groceries, and $147,226.87 on entertainment.[62] The total grocery bill does not include the $78,429.26 spent on dining out. Nor does the nearly three-quarters of a million dollars spent on personal travel include the amount

[58] Def.'s Ex. No. 1; Pls.' Ex. No. 16.

[59] Adv. Doc. No. 155 at 111:18-23. However, it is without dispute that they once had the use of the funds because they borrowed against their locked-in gains. *See supra* note 7.

[60] Adv. Doc. No. 149 at ¶¶ 77-85.

[61] Def.'s Ex. No. 1.

[62] *Id.*

spent on a rented house in Aspen, which spending totaled more than $233,000.00.[63]  Some of the other extravagances included a private education for their son—a cost which may or may not be lumped in with the $360,731.00 that the Feshbachs spent on their children—and a personal chef. "She cooked for us, she took care of our son, she . . . cleaned the house, et cetera," Mr. Feshbach explained.[64]  But personal chefs don't come cheap.  The Feshbachs paid more than $610,000.00 over eight years for their hired help.[65]

Maintaining the Belleair house—an asset that the Feshbachs in 2001 pledged to dispose of but stayed in until 2008[66]—was itself a costly venture. From 2002 through the middle of 2008, mortgage interest, property taxes, and association dues exceeded $508,000.00; "general household" costs totaled more than $574,000.00; maintenance alone was over $218,000.00; and homeowners insurance and utilities together ran nearly $182,000.00.[67] And even when the Feshbachs were unable to send payments to the Service, they always found a way to make considerable contributions to charitable causes across the country, $530,900.86 in all.[68] Notably, none of the figures above include the $1.083 million that the Feshbachs classified as "other" household and personal spending.[69]

---

[63] *Id.*

[64] Adv. Doc. No. 154 at 70:22-23.

[65] Def.'s Ex. No. 1.

[66] According to Mr. Feshbach, the Belleair house "was just impossible to sell." Adv. Doc. No. 154 at 152:5. Nevertheless, after the Feshbachs put a sign in the yard, doing away with the other marketing efforts and the "pocket listing," they sold it in one day. *Id.* at 153:14-20.

[67] Def.'s Ex. No. 1.

[68] *Id.*

[69] *Id.*

The expenditures noted above leave no doubt that the Feshbachs led a lavish lifestyle. As discussed more below, though, they say doing so was necessary to generate income; they had to keep up appearances, so to speak, or their income would dry up and their tax payments would end. The Service sees it another way: as pure excess on the government's dime.

Soon after the filing of their bankruptcy petition, the Feshbachs filed this adversary proceeding against the IRS, seeking a determination that the balance of the 2001 tax debt is dischargeable. The Service has taken the opposite position and contends that the Feshbachs' remaining debt is nondischargeable under § 523 of the Bankruptcy Code.[70] At the time their chapter 7 case commenced, the Feshbachs' debt to the United States exceeded $3.8 million.[71]

## II. *Application of the Law to the Facts*

The Bankruptcy Code reveals Congressional policy that a discharge should not relieve a debtor of certain obligations to repay his or her creditors.[72] Of particular importance here, 11 U.S.C. § 523(a)(1)(C) provides that a discharge does not discharge a debtor "for a tax . . . with respect to which the debtor . . . willfully attempted in any manner to evade or defeat."[73] Mere nonpayment of taxes, however, does not satisfy this exception to a complete discharge.[74] Rather, the government must show, by a preponderance of the evidence, that the debtor "engaged in affirmative acts constituting a willful attempt to evade or defeat payment of taxes."[75] This interpretation of § 523(a)(1)(C) respects the reasoning underlying Congress' decision to amend

---

[70] 11 U.S.C. § 523. All references to the "Bankruptcy Code" or "Code" are to 11 U.S.C. §§ 101, *et seq.*

[71] Adv. Doc. No. 1 at 2.

[72] *See* 11 U.S.C. § 523.

[73] *Id.* at § 523(a)(1)(c).

[74] *Griffith v. United States* (*In re Griffith*), 206 F.3d 1389, 1395 (11th Cir. 2000) (en banc).

[75] *Id.* at 1395-96.

the exception to its current form: permitting "an honest but financially unfortunate debtor [to make] a fresh start unburdened by what may be an overwhelming liability for accumulated taxes, while avoiding the creation of a tax evasion device."[76]

In construing exceptions to discharge, the Supreme Court instructs that such exceptions "should be confined to those plainly expressed."[77]  And when it comes to taxes, the Supreme Court says that the discharge exception statute "is not a compassionate section for debtors . . . and demonstrates congressional judgment that that certain problems—e.g., those of financing government—override the value of giving the debtor a wholly fresh start."[78]  Even so, according to the United States Court of Appeals for the Eleventh Circuit, "exceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor."[79]  One commentator suggests that court of appeals' deference to the fresh start policy is contrary to the Supreme Court's instruction of confining discharge exceptions to those plainly expressed.[80]  But in the context of the totality of the facts of this proceeding, even a liberal view, favoring the Feshbachs, still would not enable this Court to give the Feshbachs a wholly fresh start.

---

[76] *Id.* at 1395 (quoting S. Rep. No. 89–1158 (1966), reprinted at 1966 U.S.C.C.A.N. 2468) (internal quotations omitted; alteration in original).

[77] *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1760 (2013) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998)).

[78] *Bruning v. United States*, 376 U.S. 358, 361 (1964) (footnote omitted) (construing the Code's predecessor discharge exception section in the Bankruptcy Act).

[79] *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1327 (11th Cir. 2011).

[80] Jonathon S. Byington, *The Fresh Start Canon*, 69 FLA. L. REV. 115 (2017).

## A. 11 U.S.C. § 523(a)(1)(C)'s Two Prongs

The standard set forth in § 523(a)(1)(C) has two prongs—one concerning the debtor's conduct and the other concerning the debtor's mental state.[81] The conduct requirement is satisfied when the government shows that the debtor "attempted in any manner to evade or defeat" a tax.[82] Illustrated by the statutory language, "*in any manner*," § 523(a)(1)(C) does "not define or limit the methods by which a willful attempt to defeat and evade might be accomplished."[83] This open-ended approach suggests that Congress was fearful of drafting "some unexpected limitation" on § 523(a)(1)(C)'s reach.[84]  The mental state requirement is satisfied if the avoidance is "done voluntarily, consciously or knowingly, and intentionally."[85]

The Service contends that the Feshbachs' excessive spending between 2002 and 2010—during which they reported as income more than $13 million that financed "the extravagant lifestyle to which they had grown accustomed"—generally establishes the evasive behavior that § 523(a)(1)(C) requires.[86]  Specifically, the Service maintains that the excessive spending greatly reduced the Feshbachs' assets that were subject to execution and represents imprudent transfers made in the face of serious financial difficulties.[87]  The Feshbachs counter by arguing that their "spending was entirely justified and largely done to increase [their] ability to satisfy their tax

---

[81] *In re Griffith*, 206 F.3d at 1396 (en banc).

[82] 11 U.S.C. §523(a)(1)(C).

[83] *Fretz v. United States* (*In re Fretz*), 244 F.3d 1323, 1327 (11th Cir. 2001) (quoting *Dalton v. I.R.S.*, 77 F.3d 1297, 1301 (10th Cir. 1996)).

[84] *Id*. at 1327 (quoting *Dalton*, 77 F.3d at 1301).

[85] *Id*. at 1330 (citations omitted).

[86] Adv. Doc. No. 163 at 16.

[87] *Id*. at 16-17; *see Hamm v. United States* (*In re Hamm*), 356 B.R. 263, 276-77 (Bankr. S.D. Fla. 2006) (discussing the signs that may indicate that a taxpayer is attempting to evade or defeat a tax debt).

obligations."[88]   Without the spending, they conclude, there would have been no income. And with no income, there would have been no tax payments at all.   The Feshbachs' position is thus synonymous with a popular mantra: You've got to spend money to make money.   Even so, extravagant spending, while one is aware of tax debt and exercising choices that direct available assets away from payment of the tax debt, can support both § 523(a)(1)(C) prongs.[89]

### 1. The Conduct Prong

The Service correctly notes that that the government can satisfy § 523(a)(1)(C)'s conduct element by proving that a debtor attempted to evade or defeat a tax through acts of commission or acts of culpable omission. Next, the Service contends that the government need only prove one such act to meet the burden that § 523(a)(1)(C) imposes.[90] In this case, that act is the Feshbachs' excessive spending, the Service argues. The Feshbachs decidedly reject this position. "To satisfy the conduct element of § 523(a)(1)(C)," they argue, "the government must identify and prove [multiple] acts evidencing an attempt to evade or defeat a tax."[91] The Feshbachs say that no court of appeals, or even the United States District Court for the Middle District of Florida, has held otherwise.[92] That does not mean this Court cannot do so in interpreting the phrase "in any manner" and confining the interpretation to what is plainly  expressed in the § 523(a)(1)(C)  exception. Nothing in the statute requires multiple acts.

---

[88] Adv. Doc. No. 164 at 8.

[89] *Compare Hassan v. United States* (*In re Hassan*), 301 B.R. 614, 622 (S.D. Fla. 2003) ("[L]arge discretionary expenditures, when a taxpayer knows of his or her tax liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct element.") *with In re Mitchell*, 633 F.3d at 1329 (willful intent shown by discretionary spending such as buying timeshares and stock and donating to a church).

[90] Adv. Doc. No. 163 at 16.

[91] Adv. Doc. No. 164 at 7.

[92] *Id.*

The discussion starts with *In re Griffith*,[93] a case the Eleventh Circuit eventually decided *en banc*. There, an IRS audit revealed that Mr. Griffith had substantially underpaid his taxes for eight years.[94] Mr. Griffith appealed this finding; the United States Tax Court affirmed.[95] In the following year, Mr. Griffith married his longtime girlfriend and then, pursuant to an antenuptial agreement, transferred substantial assets (all of his stock in three corporations and $390,000.00 in promissory notes) to himself and his new wife as tenants by the entirety. Mr. Griffith later transferred other assets to a newly formed corporation of which his new wife was the sole shareholder.  Less than four years later, Mr. Griffith filed for bankruptcy and asked the bankruptcy court to discharge his tax liability, which at the time exceeded $2 million.[96]  Seeing Mr. Griffith's actions for what they were—nothing more than "an exchange to a family member, during a period of serious financial difficulty, for inadequate consideration"—the bankruptcy court concluded that Mr. Griffith was attempting to evade the IRS and ruled that his tax debt was thus nondischargeable.[97]

On appeal, the district court affirmed, explaining that Mr. Griffith did more than "merely us[e] income to pay debts other than his tax liability"; he intentionally allocated his assets in order to prevent the full collection of his tax liability.[98] A panel of the Eleventh Circuit initially

---

[93] *Griffith v. United States* (*In re Griffith*), 206 F.3d 1389 (11th Cir. 2000) (en banc).

[94] *Id.* at 1391.

[95] *Id.*

[96] *Id.*

[97] *In re Griffith*, 161 B.R. 727, 734 (Bankr. S.D. Fla. 1993), *aff'd*, 210 B.R. 216 (S.D. Fla. 1997), *rev'd*, 174 F.3d 1222 (11th Cir. 1999), *reh'g en banc granted, opinion vacated*, 182 F.3d 1297 (11th Cir. 1999), and *aff'd on reh'g en banc*, 206 F.3d 1389 (11th Cir. 2000).

[98] *In re Griffith*, 210 B.R. 216 (S.D. Fla. 1997), *rev'd*, 174 F.3d 1222 (11th Cir. 1999), *reh'g en banc granted, opinion vacated*, 182 F.3d 1297 (11th Cir. 1999), and *aff'd on reh'g en banc*, 206 F.3d 1389 (11th Cir. 2000).

reversed,[99] but then granted rehearing *en banc*, vacated the prior panel opinion, and affirmed the decisions below.[100] "It is undisputed that Griffith engaged in intra-family transfers of property for little to no consideration," the court recognized.[101] "In light of our holding in this case"—that § 523(a)(1)(C) does render nondischargeable tax debts where the debtor engaged in affirmative acts constituting a willful attempt to evade or defeat payment of taxes—"we find that the district court did not err in affirming the bankruptcy court's finding that Griffith had engaged in conduct covered by § 523(a)(1)(C)."[102]

Each court that reviewed Mr. Griffith's case eventually concluded that his willful failure to pay his taxes coupled with the act of intra-family transfers for inadequate consideration rendered his tax debt nondischargeable. As the Service sees it, the *Griffith* case proves its position that failure to pay plus one other evasive act can suffice to establish § 523(a)(1)(C)'s conduct requirement.   But there were *multiple* transfers and therefore *multiple* acts, the Feshbachs might argue.  Perhaps so.  But therein lies the point: § 523(a)(1)(C)'s conduct prong cannot be reduced to an exercise in counting.  One judge may see a series of expenditures on one budget item or a series of transfers to one family member as one act, where another sees two or more, even though they both conclude that the same debtor willfully evaded his tax debt.  More importantly, the statute itself does not call for such an elementary examination, under which one evasive act is never enough, but two or more likely is.  Instead, the inquiry is qualitative and subject to the unique circumstances that each case presents.[103] The statutory language provides

---

[99] *In re Griffith*, 174 F.3d 1222 (11th Cir. 1999), *reh'g en banc granted, opinion vacated*, 182 F.3d 1297 (11th Cir. 1999), and *aff'd on reh'g en banc*, 206 F.3d 1389 (11th Cir. 2000).

[100] *In re Griffith*, 182 F.3d 1297 (11th Cir. 1999), and *aff'd on reh'g en banc*, 206 F.3d 1389 (11th Cir. 2000).

[101] *In re Griffith*, 206 F.3d at 1396.

[102] *Id.* at 1395-96.

[103] *In re Fretz*, 244 F.3d at 1328 (citing *United States v. Fegeley* (*In re Fegeley*), 118 F.3d 979, 983 (3d Cir. 1997)).

the exact question: has the debtor "attempted *in any[104] manner* to evade or defeat" a tax?  And this is the question that the Court will address.

An in-depth look at the Feshbachs' spending provides the answer. The Feshbachs argue that such a review cuts in their favor, and they have presented multiple arguments to substantiate this position. The Feshbachs first suggest, citing *In re Pisko*[105] and *In re Kight*,[106] that bankruptcy courts in the Middle District of Florida have explained "that where a debtor spends money in the face of tax debt in an effort to generate income to pay that debt, that spending is not an attempt to evade or defeat a tax."[107] Not only is that incorrect, such a carte-blanche standard would be entirely imprudent.[108]  It would allow every indebted taxpayer to take any risk—even a shot in the dark—on any business venture, including a novice's attempt to become a professional poker player, all with the dream that it *might* turn out right-side up. And when it (almost surely) doesn't, the indebted taxpayer, having filed bankruptcy, will be free to go, while the IRS is left holding the bag.

In *In re Pisko*, the debtor purchased a bar in New York City for $63,000.00[109] This turned out to be a "financially disastrous investment" that never turned a profit.[110] Despite this bad bet in which the debtor "'lost everything,'" the court found in favor of the debtor: "Under *the*

---

[104] "Any," when used in a "sentence implying a selection or discretionary act will follow . . . may mean one or more." BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 57 (4th ed. 2016).

[105] *United States* (*In re Pisko*), 364 B.R. 107 (Bankr. M.D. Fla. 2007).

[106] *Kight v. IRS* (*In re Kight*), 460 B.R. 555 (Bankr. M.D. Fla. 2011).

[107] Adv. Doc. No. 164 at 10.

[108] *See United States v. Jacobs* (*In re Jacobs*), 490 F.3d 913, 926 (11th Cir. 2007) (citing *In re Hassan*, 301 B.R. at 622 (S.D. Fla. 2003) ("[L]arge discretionary expenditures, when a taxpayer knows of his or her tax liabilities, is capable of meeting them, but does not, are relevant to § 523(a)(1)(C)'s conduct element.").

[109] *In re Pisko*, 364 B.R. at 109.

[110] *Id.* at 116.

*particular circumstances* of this case, . . . after having evaluated the Debtor's candor and demeanor, the Court finds that the Debtor's 'conduct' does not warrant a finding of nondischargeability."[111]  Importantly, the court found that the "unsophisticated" debtor was generally unaware of the tax liability that he faced.[112]  In a somewhat similar story, the debtors in *In re Kight* invested $100,000.00 in a mutual fund account and $40,000.00 in a bar, which they planned to operate in order to earn their living.[113]  The bar eventually went under, and after the September 11, 2001 attacks, the value of the mutual fund account fell considerably.[114]  The debtors used what remained to sustain their family, paying for the necessities and their autistic son's medical care and schooling.[115]  Although the debtors "mistook the priority and importance of their tax liability, choosing instead to pay personal expenses," the court concluded that "their conduct amounts to nothing more than a failure to pay and does not satisfy the conduct requirement set forth in § 523(a)(1)(C)."[116]  Certainly, neither *In re Pisko* nor *In re Kight* stands for the broad proposition, as the Feshbachs suggest, that debtors can attempt to spend their way out of tax trouble with impunity.  More than that, neither case involved the type or magnitude of spending that the Feshbachs' case presents.

The Feshbachs next argue that their "spending was not done in an attempt to evade or defeat the tax; rather, [it] was entirely justified and largely done to increase [their] ability to

---

[111] *Id.* (emphasis added).

[112] *Id.* at 113, 115.

[113] *In re Kight*, 460 B.R. at 558-59.

[114] *Id.* at 559.

[115] *Id.*

[116] *Id.* at 564.

satisfy their tax obligations."[117] According to Mr. Feshbach, all of the expenses were necessary to create an environment in which he could add value to his business relationships.[118] "[L]iving in the right neighborhood with the right people . . . was an investment in . . . future earning power."[119] "So keeping the house," Mr. Feshbach decided, "got the government a whole lot more money."[120] This is why the Feshbachs spent nearly $1.5 million (not including the nearly $1.1 million of unallocated "other" household and personal expenses) over a seven-year period to live in a multi-million dollar house—housekeeper and gardener included.[121]

The Feshbachs "came to learn very quickly that people really valued being in [their] home more than they valued looking at a menu."[122] So they routinely hosted dinner parties at their house three to four times per week. According to the Feshbachs' counsel, the nature of Mr. Feshbach's relationships "did not allow him to take [an] investor to Morton's to sit and have a steak, or to Bern's and have a little plaque behind the seat that says MLF or Matt Feshbach."[123] Mr. Feshbach could not merely "have a little vault in the wine locker at the front of the restaurant and say: Look how big I am."[124] In other words, he *had* to have people come to his house. This is why the Feshbachs had a full-time personal chef on staff, along with other household employees, at a monthly cost of more than $6,000.00 and a total cost of $610,640.09 over an eight-year

---

[117] Adv. Doc. No. 164 at 8.

[118] Adv. Doc. No. 154 at 172:1-2.

[119] *Id.* at 162:1-4.

[120] *Id.* at 152:16-17.

[121] Def.'s Ex. No. 1.

[122] Adv. Doc. No. 154 at 176:25-177:2.

[123] *Id.* at 41:22-42:1.

[124] *Id.* at 42:1-3.

period.[125] This would also be the reason why their monthly grocery bill exceeded $4,400.00 on average.[126]

The Feshbachs also understood the impact of fine clothing and luxury cars. As Mr. Feshbach retold at trial, his neighbor, who was his second biggest investor, once told him that he wears $6,000.00 suits "because with the people that I deal with, this is the kind of suit I need to appear in."[127] Mr. Feshbach evidently decided that he needed similar suits. Between 2003 and the first part of 2010, the Feshbachs spent more than $500,000.00 on clothing and care.[128] This figure presumably includes the cost of the person who came to iron Mr. Feshbach's business clothes.[129] Also, it appears that the half-of-being-good-is-looking-good philosophy also rings true for transportation. Over roughly the same period of time, the Feshbachs spent just under $170,000.00 on their cars, which at varying times included two Mercedes-Benzes, a BMW, and a Lexus.[130] In his community, cars mattered, Mr. Feshbach pointed out.[131]

The Service considers each one of the above expenditures to be excessive and gratuitous. Altogether, the Service considers the Feshbachs' spending as an attempt to evade their tax debt. And the Service presented a compelling case to prove as much. At a time when they owed millions of dollars to the government, the Feshbachs spent money with near reckless abandon.

---

[125] *Id.* at 175:11-16; Def.'s Ex. No. 1. The Feshbachs' testimony does not make clear how many people they hired as household employees.

[126] Def.'s Ex. No. 1.

[127] Adv. Doc. No. 154 at 79:12-80:6. This story that Mr. Feshbach recalled took place three weeks before trial. The Court assumes that Mr. Feshbach must have adopted a similar rationale when he actually made his clothing purchases, many years before his neighbor passed this wisdom along.

[128] Def.'s Ex. No. 1.

[129] Adv. Doc. No. 154 at 178:7-9.

[130] Def.'s Ex. No. 1.

[131] Adv. Doc. No. 154 at 79:11-12.

But the Feshbachs stick strong to the idea that these expenses, which they "incurred to cultivate [a] culture[,] were crucial to [Mr.] Feshbach's ability to attract and retain clientele . . . and thus generate income."[132] Had they changed at all—by cutting "back on the upkeep of their house," by not employing a private chef, by no longer wearing "setting-appropriate clothing," by driving "different, less expensive cars," and so on—investors would have noticed, confidence in Mr. Feshbach would have dropped, and "the IRS would have been worse off."[133] Of course we will never know whether this theory is true. More to the point, the Feshbachs failed to produce any evidence—apart from Mr. Feshbach's self-serving testimony—to suggest that there is any correlation between a money manager's spending on his household and personal items and the confidence in which his or her clients place him.[134] One might safely assume that there is, instead, a direct correlation between a money manager's ability to produce positive results and client confidence. But that is a question for another day.

With their third argument, the Feshbachs contend that even if their spending was excessive, "[n]one of the IRS personnel involved in [their] case . . . ever told [them] to lower their expenses."[135] Even if this were correct (which it isn't), the Feshbachs have not explained why it would matter. True, if the Service (or even one revenue officer) *approved* the Feshbachs excessive spending, the Service would be hard-pressed to later persuade a bankruptcy court that such spending qualifies as an attempt to evade or defeat a tax under § 523(a)(1)(C). But that's

---

[132] Adv. Doc. No. 164 at 9.

[133] *Id.* at 11.

[134] This is not to say that there is no correlation at all. But to prove that there is, the Feshbachs could have, for example, called as witnesses those individuals whom they say wouldn't have invested with Mr. Feshbach had he not led the life that he did. *See id.* ("Three of the Feshbachs' most prominent investors, Jim Harper, Larry Morgan, and Dennis Doyle, lived in the same neighborhood as the Feshbachs in Belleair.")

[135] Adv. Doc. No. 167 at 7.

not the Feshbachs' point. They are not arguing estoppel, they say.[136] The Feshbachs, at all times relevant here, were indebted to the federal government. They have never disputed that. Between 2001 and the date of their bankruptcy filing, the Feshbachs attempted on many occasions to reach an agreement with the IRS to reduce their tax debt and/or pay it over time. Over this extended period, the Feshbachs had extensive interaction with the IRS. And now that their efforts largely failed, they want the IRS held accountable not for what its revenue officers did or said, but for something the revenue officers didn't say. That's a peculiar and unpersuasive argument.

More importantly, on multiple occasions, IRS revenue officers directly confronted the Feshbachs' excessive spending. As part of the 2001 temporary agreement (which the Feshbachs proposed), the Feshbachs, after personal discussions with IRS revenue officers, agreed to reduce their standard of living—a point that Mr. Feshbach admitted during trial.[137] Two years later, in 2003, a revenue officer explained that the Feshbachs' "excessive expenses" "could even be considered egregious."[138] Then, in 2009, another revenue officer, in reviewing one of the Feshbachs' offers-in-compromise, also concluded that the Feshbachs were spending too much money.[139] The Feshbachs concede they were aware of the revenue officers' concerns.[140]

The Feshbachs do not argue that the IRS blessed their spending. Instead, looking for a scapegoat, they say that the IRS erred by not warning them of their bad habits. But that's not the

---

[136] *Id.* at 8.

[137] Adv. Doc. No. 154 at 193:21-25.  Indeed, a reduction in the Feshbach's standard of living was an express condition of the temporary agreement. Adv. Doc. No. 149 at ¶ 25. Despite this conceded fact, the Feshbachs imply that the revenue officer's directive to raise funds from liquidation equates to a directive to spend money to make money. Adv. Doc. No. 164 at 8.

[138] *Id.* at ¶ 40. The same revenue officer also stated that the expenses could be allowed if they were "necessary for production of income." But the Feshbachs have not shown that they were.

[139] Adv. Doc. No. 167 at 7 n.24.

[140] *Id.*

IRS's responsibility. As one revenue officer explained at trial, "If the expenses are too high, we tell them what expenses are too high."[141] "[W]e don't tell them what they can spend their money on."[142] The Feshbachs cannot blame the Service for their not heeding its warnings.

The Feshbachs might be able to credibly claim that a *portion* of their excessive spending was intended to further Mr. Feshbach's earning potential. But it is insincere to argue that *all* of it was. Yet, they do just that.[143] According to Mr. Feshbach, you cannot put your spending "in a silo and say that part of your lifestyle was for your children, that part of your lifestyle was for your religion, and that part of your lifestyle was for your business."[144] They are "inextricably linked," he explained.[145] Under this line of thinking, one is asked to assume, for instance, that the $721,806.60 that the Feshbachs spent on personal travel, or the $530,900.86 that they spent on charitable contributions, or the $360,731.57 that they spent on their children aided their ability to fully repay their tax debt. But that makes no sense. And the wrongness of this argument was exposed at trial.

Mr. Feshbach testified that MLFI generally paid for the cost of business travel.[146] Accordingly, what the Feshbachs refer to as personal travel expenses—as opposed to business travel expenses, which has its own line item on the Feshbachs' profit and loss statements—had little, if anything, to do with Mr. Feshbachs' ability to earn money. Then, when asked, Mrs. Feshbach flatly rejected the idea that she and Mr. Feshbach would entertain potential investors

---

[141] Adv. Doc. No. 155 at 210:16-17.

[142] *Id.* at 210:19-20.

[143] Adv. Doc. No. 167 at 8 ("Matt Feshbach genuinely believed the Feshbachs' expenses were a necessary component of his ability to earn income to pay off the 1999 and later the 2001 labilities.").

[144] Adv. Doc. No. 154 at 81:2-6.

[145] *Id.* at 81:6-7.

[146] *Id.* at 184:19-25.

outside of the house: "No. It's just something we've never done."[147] Consequently, the $225,656.13 that the Feshbachs spent on entertainment and dining out, like their personal travel budget, could have no bearing on the Feshbachs' earning potential.[148]

Similarly, how does any portion of the Feshbachs' half-million dollars-plus in charitable contributions aid them to repay their tax debt?  If there's an explanation, it wasn't offered at trial. As a rule, it's hard to imagine how giving money away would bolster an individual's future income potential.  And this case is no exception to that rule.  The overwhelming majority of the Feshbachs' charitable giving benefitted a church that happened to be one to which Mrs. Feshbach's personal interests were directly tied.[149]  In fact, Mrs. Feshbach owned and operated her own mission, with the main purpose of "introduc[ing] people to what [her church's religion] is."[150]  Thus, it's quite clear that there was no link at all between the hundreds of thousands of dollars that the Feshbachs donated to the church and Mr. Feshbach's earnings, but rather, there was a direct link between the charitable spending and Mrs. Feshbach's religious pursuits. The Court does not admonish the Feshbachs (or any other debtors) for supporting worthy charitable causes.  However, "[i]f individuals choose to donate part of their income to charity, whether religious or secular, they must adjust their expenditures accordingly to live within the confines of their available income."[151]

One final expenditure deserves mention.  Between 2005 and 2007, a period of time in which the Feshbachs owed millions of dollars in unpaid taxes, the Feshbachs spent $233,529.76

---

[147] Adv. Doc. No. 155 at 158:11-13.

[148] Def.'s Ex. No. 1.

[149] Adv. Doc. No. 155 at 156:7-22.

[150] *Id.* at 156:10:11.

[151] *Geltzer v. Crossroads Tabernacle* (*In re Rivera*), 214 B.R. 101, 108 (Bankr. S.D.N.Y. 1997).

on a house they rented in Aspen.[152] Apparently, the house served one purpose: pure personal enjoyment. For a period of time, the Feshbachs' son was homeschooled in Aspen.[153] Mr. Feshbach had nothing more to say about the house during trial. And Mrs. Feshbach never mentioned it. Importantly, they haven't once claimed that they ever hosted—or even invited— one investor or potential investor to this mountain retreat.

Between 2002 and 2010—a period in which the Feshbachs' reported income exceeded $13 million[154]—the Feshbachs preferred their lofty lifestyle over reducing their tax debt at nearly every turn. At times, yes, they did make payments in accordance with the agreements that they made with the IRS. Far more often, though, they paid little to nothing. All the while, they spent more than $8.5 million on personal and household expenses and charitable giving.[155] While mere nonpayment of taxes is insufficient to deny a debtor a discharge,[156] the case law "has consistently held section 523(a)(1)(C)'s requirements to be satisfied in situations where the debtor—even without fraud or evil motive—has prioritized his or her spending by choosing to . . . pay for other things . . . before the payment of taxes, and taxes are knowingly not paid."[157] To this point, contrast the Feshbachs' behavior with that of the debtor in *In re Lindros*,[158] who prevailed in his similar dischargeability fight because he had curbed his expenditures once he got into tax and other financial trouble.

---

[152] Def.'s Ex. No. 1.

[153] Adv. Doc. No. 154 at 185:18-19.

[154] Adv. Doc. No. 149 at ¶¶ 77-85.

[155] Def.'s Ex. No. 1.

[156] *In re Griffith*, 206 F.3d at 1395.

[157] *Lynch v. United States* (*In re Lynch*), 299 B.R. 62, 64 (Bankr. S.D.N.Y. 2003).

[158] *Lindros v. United States* (*In re Lindros*), 459 B.R. 842, 848-849 (Bankr. M.D. Fla. 2011), *aff'd*, 484 B.R. 233 (M.D. Fla. 2012).

Agreeing with and adopting the wording of *In re Lynch*, this Court rejects "the notion that one can justify expenditures of the type sought to be justified here by the assertion that others expect one to live that way. Among many other things, endorsing an argument of this character would create special rules for the wealthy, which this Court will not do."[159] Considering all of the circumstances of this case, the Court concludes that the Feshbachs' conduct establishes that they "attempted  . . .  to evade or defeat" a tax within the meaning of the first prong of § 523(a)(1)(C).[160]

## 2. The Mental State Prong

To prove that a debtor's tax debt is nondischargeable, the government must not only show that the debtor attempted to evade or defeat a tax obligation, but also that the debtor did so willfully.[161] To satisfy this requirement, the government must establish that a debtor "(1) had a duty to file income tax returns and pay taxes; (2) knew he had such a duty; and (3) voluntarily and intentionally violated that duty."[162] The government need not establish that the debtor acted with fraudulent intent.[163] The Feshbachs do not contest the first two elements; they concede that they had and knew of the duty to pay the outstanding 2001 tax debt.[164] Thus, the only question that remains is whether they voluntarily and intentionally refused to do so.

---

[159] *Lynch*, 299 B.R. at 84-85.

[160] 11 U.S.C. §523(a)(1)(C). The Service also suggests that the Feshbachs' unreasonably low offers-in-compromise, along with their unwillingness to at times provide clear and accurate information in response to Service inquiries, is further evidence of their attempt to avoid their tax debt. Adv. Doc. No. 163 at 3-15. Because the Court concludes that the Feshbachs' excessive spending alone satisfies the conduct prong of § 523(a)(1)(C), it is unnecessary to consider the merits of this argument at this point. However, the offers-in-compromise are evidence of the mental state prong.

[161] 11 U.S.C. § 523(a)(1)(C).

[162] *In re Fretz*, 244 F.3d at 1330.

[163] *Id.*

[164] Adv. Doc. No. 154 at 63:9-12; Adv. Doc. No. 164 at 22.

The Feshbachs adamantly reject the notion that they willfully attempted to avoid their tax obligations. Rather, they say that the evidence supports a determination that they worked "doggedly to resolve" them.[165] They offer many arguments to reinforce this idea, which the Court will address in turn.

To begin, the Feshbachs contend that they "worked steadily within the system created by the IRS to resolve outstanding tax liabilities" for nearly a decade.[166] They gave "up on working out a resolution with the IRS," they say, "[o]nly when they were completely exhausted and demoralized by the rapidly accruing 2001 liability."[167] The IRS counters by arguing that the Feshbachs did not *work within* the system but, rather, *worked* the system. The Feshbachs' offers-in-compromise were part of a "deliberate design to avoid full payment," the IRS maintains.[168] To review, the Feshbachs submitted three-offers-in-compromise, only two of which concerned the 2001 tax debt. In June 2001, the Feshbachs offered $1 million, paid over five years, to settle their 1999 tax debt, which exceeded $2 million.[169] The IRS considered this offer a "nonstarter"[170] because the Feshbachs were living "way over allowable living expenses."[171] The Feshbachs withdrew this offer before the IRS could act on it. One year later, in September 2002, soon after incurring the 2001 tax liability, they submitted a $1.25 million offer for the 1999 and 2001 tax

---

[165] Adv. Doc. No. 164 at 22.

[166] *Id.* at 23.

[167] *Id.*

[168] Adv. Doc. No. 163 at 22.

[169] Adv. Doc. No. 149 at ¶ 15.

[170] Adv. Doc. No. 155 at 178:12-179:1.

[171] Adv. Doc. No. 149 at ¶ 23.

debts, which at the time totaled more than $6 million.[172] The IRS rejected this offer because its review of the Feshbachs financial situation showed that they "had the ability to fully pay the tax liability."[173]    Finally, in September 2008, after defaulting on their installment repayment plan, the Feshbachs' proposed to settle the remaining tax debt exceeding $3.6 million for $120,000.00, paid over four years.[174] The IRS also passed on this deal. Why would a creditor ever agree to take less than 25 cents on the dollar (at best, with respect to the 2002 offer-in-compromise) when the creditor sees that the debtor's income and spending both far exceed what he or she is owed? No reasonable creditor would, of course, which is exactly why one IRS revenue officer concluded "that the entire offer process was a delay by Mr. Feshbach."[175] Taken in context, the Feshbachs' offers-in-compromise proved to be a cat-and-mouse campaign to delay the inevitable.[176]

As explained above, throughout the period in which the Feshbachs proposed their offers-in-compromise for the 2001 tax debt, they were reporting millions of dollars in income, more than $13 million in all, and $10,459,762.00 from 2005-2007.[177] They were also spending money

---

[172] *Id.* at ¶ 28.

[173] Adv. Doc. No. 155 at 90:7-8.

[174] Adv. Doc. No. 149 at ¶ 91.

[175] Pls.' Ex. No. 16. At trial, on direct examination, the same revenue officer first testified that he did not conclude in the past that the Feshbachs were delaying collection efforts. Adv. Doc. No. 155 at 200:11-15. Later, on cross-examination, when IRS counsel showed him his case file notes, he corrected himself, explaining that he did conclude, as his notes indicated, that the Feshbachs were using offers-in-compromise as a delay tactic. *Id.* at 214:7-215:1. Considering the revenue officer's full testimony, the Court finds that the revenue officer's notes that he made contemporaneously in dealing with the Feshbachs' case are more reliable than his initial memory of the matter eleven years later.

[176] Alternatively, the Feshbachs suggest that their practice of providing documentation in support of their offers-in-compromise disproves that they acted willfully in evading their 2001 tax debt. Adv. Doc. No. 164 at 27. This is incorrect. Providing "reams of documents and information to the IRS" to support unreasonably low offers-in-compromise only served to delay the IRS' review of those offers. All the while, the Feshbachs continued to imprudently spend the money that the IRS was due.

[177] Adv. Doc. No. 149 at ¶¶ 77-85.

at break-neck speed, more often than not on clearly unnecessary items. During the 2005-2007 time period alone, the Feshbachs could easily have retired their tax debt or at least set aside enough money to ensure they could fulfill their obligation under their quarterly installment agreement—and they still would have been left with an average of more than $2,000,000.00 per year to live on. Hardly does this picture show a dedicated, good faith effort to reach a settlement with the IRS.

All the same, the Feshbachs contend that their offers-in-compromise cannot be held against them because they merely followed their advisors' lead when deciding on the details of their offers.[178] To support this claim, the Feshbachs point to *In re Zimmerman*.[179] The debtor in that case was the co-owner of an energy corporation and was interested in investing in and promoting coal mines, but he had no experience in the coal mining industry.[180] Accordingly, prior to getting in too deep, the debtor hired geologists, engineers, and accountants to "assess and to review the viability of the coal mines" that he was focused on.[181] Based on their advice, he moved forward with his plans. Still, the coal mines flopped. To make matters worse, following an audit, the IRS concluded that his claimed tax deductions for the losses associated with the coal mining venture should be disallowed.[182] The debtor filed bankruptcy and sought a determination that his tax debt was dischargeable. Ultimately, in part because there was no evidence to show that he was unjustified in following the advice of his professional advisors, the

---

[178] Adv. Doc. No. 167 at 25-26.

[179] *Zimmerman v. United States* (*In re Zimmerman*), 204 B.R. 84, 88 (Bankr. M.D. Fla. 1996), *as amended*, (Dec. 11, 1996).

[180] *Id.* at 88-89.

[181] *Id.*

[182] *Id.* at 87.

court granted him a complete discharge, explaining that "[reasonable] reliance on a professional as to tax matters can be a defense to willful evasion.[183]

The Feshbachs' case shows a different picture. First, unlike the debtor in *Zimmerman* and the coal mining industry, Mr. Feshbach was not completely unacquainted with the tax code or IRS practices.  While Mr. Feshbach is not a tax lawyer or an accountant, he is a financial professional who had enough understanding of the tax laws to enable him to collect millions of dollars of income over many years without sending one dime to the IRS during that time on account of that revenue.  Mr. Feshbach might reply that the tactic that enabled him to accomplish this—selling short against the box—was widely known amongst financial professionals. And maybe it was. But combing through tax code regulations shows an added level of dedication; according to Mr. Feshbach, when he and his wife were considering submitting offers-in-compromise, he studied the regulations because he had "a habit of doing [his] homework."[184]

Worse, the circumstances of the Feshbachs' story belie their claim that they *reasonably* relied on their advisors. Over the period in question, the Feshbachs reported more than $13 million income and spent more than $8.5 million to support their abundant lifestyle.[185] Considering these facts, it would have been anything but reasonable for the Feshbachs to believe that the IRS would have accepted their meager offers-in-compromise—especially after the IRS's direct condemnation of the Feshbachs' unwarranted spending. The Feshbachs' advisors may have given them bad advice, but that topic wasn't fully explored at trial.  Regardless, it matters not. With their level of sophistication, the Feshbachs should have realized that the federal government wasn't going to hand out Black Friday discounts to taxpayers who couldn't find

---

[183] *Id.* at 88-89.

[184] Adv. Doc. No. 154 at 130:20-21.

[185] Adv. Doc. No. 149 at ¶¶ 77-85; Def.'s Ex. No. 1.

their way without a personal chef, expensive suits, and a $4,400.00 monthly grocery bill.[186] These and the other buckets of discretionary spending, as noted above, support willful intent.[187]

The Feshbachs next explain that the 2001 tax liability did not arise due to underreporting or misstating of income.[188] That is absolutely true. But it has no bearing on the relevant question. Section 523(a)(1)(C) denies a discharge for a tax debt when a debtor willfully attempts to evade or defeat a tax.  And it also denies a discharge for a tax debt when a debtor makes a fraudulent return[189]—something that the IRS concedes the Feshbachs did not do. Thus, because underreporting or misstating of income is not essential to a denial of a discharge under § 523(a)(1)(C), the Feshbachs' point proves nothing.

The Feshbachs' next argument is that "there is no evidence in the record that at any point . . . the Feshbachs had the ability to pay the tax in full but chose not to do so."[190] This is a surprising argument that requires little attention given their substantial income. Yet, a few points are worth highlighting. The Feshbachs' emphasis on their inability to pay the tax in full in a lump sum is misplaced. This was never an all-or-nothing situation. The IRS consistently worked with the Feshbachs to arrange situations in which they could repay their 2001 tax debt over time.

---

[186] Although this proceeding is not about an abusive chapter 7 filing under 11 U.S.C. § 707(b), it is noteworthy that this amount is about seven times the standard for food for an above-state-median-income family of three under the so-called means test of § 707(b)(2).  The food standard is based on the IRS Collection Financial Standards. Although the Feshbachs are clearly above-median debtors, they were not subject to the means test because their debts were not primarily consumer debts.

[187] *In re Mitchell*, 633 F.3d at 1329 (willful intent shown by discretionary spending such as buying timeshares and stock and donating to a church); *see also*, *United States v. Lindros*, 484 B.R. 233, 239 (M.D. Fla. 2013) ("the *mens rea* requirement of the statute is clear:" the IRS must "prove that . . . the taxpayer knew that taxes were due, knew of available resources with which to pay those taxes, and—with the objective of nonpayment of taxes—elected to otherwise use . . . the resources at a time and manner that the taxpayer recognized would cause the taxes to remain unpaid.").

[188] Adv. Doc. No. 164 at 22.

[189] 11 U.S.C. § 523(a)(1)(C).

[190] Adv. Doc. No. 164 at 24.

More to the point, the Feshbachs could have immediately reduced their tax debt by more than $1 million by simply canceling their personal vacations and giving up the rented house in Aspen. They could have saved a similar amount by dramatically reducing their unreasonable clothing allowance and foregoing charitable giving altogether.  These are just a few of the available examples that prove the superficiality of their claimed inability to pay.

Likewise, the Feshbachs argue that their "actions over the years emphasize good faith rather than any intent to evade or defeat" the 2001 tax debt.[191] They point to many examples to substantiate this point. First among them is their listing of the Belleair house for sale in 1999. This is not persuasive, considering that the Feshbachs did not sell the Belleair house until nine years later. (And Mr. Feshbach's testimony strongly suggests that they had no intention of selling it any earlier: "[W]e could see we needed to cut our expenses but we wanted to hold onto the house because it had been a bit of a gift from God."[192]) They also say that consenting to an extension of the period in which the IRS could collect the 2001 tax debt shows that they were doing what they could to help the IRS collect what it was owed.[193] But it doesn't.  Extending the recovery period was, quite logically, a precondition to the IRS's approving the installment agreement that the Feshbachs requested in 2005.[194] In other words, the Feshbachs had no other choice but to consent to this extension if they wanted an extended time to pay. One final example: The Feshbachs argue that between 2001 and 2011 they paid $65,000.00 more than the total principal amounts of the 1999 and 2001 tax debts.[195]  If so, that is because the Feshbachs

---

[191] *Id.* at 25.

[192] Adv. Doc. No. 154 at 153:11-13.

[193] Adv. Doc. No. 164 at 25.

[194] Adv. Doc. No. 149 at ¶ 165.

[195] Adv. Doc. No. 164 at 26.

were required to pay penalties and interest over this ten-year period as their tax debts remained unpaid. Penalties and interest are negative consequences that come with failing to timely meet tax responsibilities. The Feshbachs offer other instances to prove their point. But the Court finds none of them compelling, particularly when compared to the Feshbachs' excessive spending.

As a final point, the Feshbachs contend that the IRS failed to establish any of the badges of fraud.[196] This argument seems to be an attempt to artificially raise the burden of persuasion. The Eleventh Circuit has explained that proof of fraud is not a necessary element of § 523(a)(1)(C)'s mental prong.[197] Rather, the Eleventh Circuit has adopted a noncriminal willfulness test, which requires, for purposes of § 523(a)(1)(C), that the government show that a debtor avoided his tax debt voluntarily and intentionally.[198] This standard "prevents the application of the exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate."[199]

Here, after having the opportunity (and being suggested or directed) to liquidate assets and cut expenses, the Feshbachs clung fiercely to their casuistry concerning the need to maintain a rich lifestyle.  Mr. Feshbach, in particular, in *ipsi-dixit* style, conveyed the impression at trial that "it is the right thing to do because I say it is the right thing to do, regardless of other reasonable options." The Feshbachs took advantage of their entrenchment in this position as cover for eschewing cost-cutting and realistic offers.

After considering the evidence in this case, the Court is convinced that the Feshbachs willfully (but not fraudulently) attempted to evade their tax debt. They did so by spending

---

[196] *Id.* at 27.

[197] *In re Fretz*, 244 F.3d at 1330 (citing *In re Fegeley*, 118 F.3d at 984).

[198] *Id.* (citing *In re Fegeley*, 118 F.3d at 984; *In re Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996)).

[199] *Id.*  (internal quotations omitted) (quoting *In re Birkenstock*, 87 F.3d at 952).

millions of dollars on their upscale lifestyle rather than paying down their debt and by using offers-in-compromise in a calculated manner to delay IRS collection efforts. The detrimental nature of the Feshbachs' actions—always choosing themselves over their obligation to the government—decidedly outweighs whatever marginal benefit (if any) their unrestrained spending had on Mr. Feshbach's ability to produce income. The Feshbachs consciously dedicated themselves to leading a very fine lifestyle while knowing that they were in serious debt. The Feshbachs spent millions of dollars in this effort. The cost today is a denial of a complete discharge.

### B. The Extent of Nondischargeability under § 523(a)(1)(C)

Having concluded that the Feshbachs' tax debt meets the exception to dischargeability found in § 523(a)(1)(C), the question remains whether the Court is required to deny the Feshbachs a discharge as to the 2001 tax debt in its entirety or, instead, is permitted to grant a partial discharge—if, for example, the Court determined that the Feshbachs would not have been able to satisfy their entire tax debt even if they had restrained their spending. The Court is not aware of a case in which the Eleventh Circuit has addressed this question.  In fact, it appears that very few courts throughout the country have done so. Nevertheless, as both the Feshbachs and the Service note, the majority of the courts that have confronted this issue have concluded, based on the express terms of § 523, that a partial discharge is not a permissible resolution.[200] This is clearly the answer that the statute compels.

---

[200] *See*, *e.g.*, *United States v. Brown* (*In re Brown*), 2012 WL 1970249, at *7 (Bankr. D. Utah May 31, 2012); *Carlin v. United States* (*In re Carlin*), 318 B.R. 556, 566 (Bankr. D. Kan. 2004), *aff'd*, 328 B.R. 221 (B.A.P. 10th Cir. 2005); *In re Lynch*, 299 B.R. at  86-88.

"The task of resolving the dispute over the meaning of § [523(a)(1)(C)] begins where all such inquiries must begin: with the language of the statute itself."[201] And "[i]n this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"[202] Section 523(a)(1)(C) speaks in unambiguous and absolute terms. It denies a discharge for "any debt with respect to which the debtor . . . willfully attempted in any manner to evade or defeat."[203] These words cannot be read to allow individualized judicial determinations as to the amount of debt that is dischargeable.  If a debtor's conduct and intent with respect to a tax debt meet the requirements of § 523(a)(1)(C), a court cannot look further.  At that point, the court must deny the debtor a discharge as to the entire tax debt. We presume that if Congress has intended it any other way, it would have said as much, as it did, for instance, in § 523(a)(2) and § 523(a)(7)—utilizing the limiting phrase "to the extent."[204] "Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally."[205]

Alternatively, the Feshbachs suggest that the Court could discharge a portion of their debt by utilizing its "far-reaching powers of [11 U.S.C.] § 105(a)."[206]  This is incorrect.  As the Supreme Court has explained, while "[a] bankruptcy court has statutory authority to 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of' the

---

[201] *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989) (citing *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985)).

[202] *Ron Pair Enterprises*, 489 U.S. at 241 (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

[203] 11 U.S.C. § 523(a)(1)(C).

[204] 11 U.S.C. §§ 523(a)(2), (a)(7); *see also In re Lynch*, 299 B.R. at 88 (explaining that the presence of the phrase "to the extent" in other subsection of § 523 "indicate[s] awareness on the part of Congress of its ability to legislate provisions authorizing a fine-tuning of the extent of discharge when the circumstances would warrant it").

[205] *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012).

[206] Adv. Doc. No. 167 at 30.

Bankruptcy Code,"[207] it may not "contravene specific statutory provisions" when "exercising those statutory and inherent powers."[208] "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."[209]

That being said, the Court is not convinced that § 523(a)(1)(C)'s inflexible standard best serves the aims of the Bankruptcy Code. Courts have consistently recognized that one of the primary goals of our bankruptcy system is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes."[210] But § 523(a)(1)(C)'s hard-line approach thwarts this fundamental goal in cases in which a portion of the tax debt could never reasonably be expected to be paid even if the debtor re-routed all non-essential spending to payment of his debt. It is this Court's hope that Congress may one day revisit this provision, perhaps with an understanding that fairness and equity may sometimes demand more compassionate solutions for uncommon cases.

## Conclusion

Sometimes, as with the facts in this proceeding, it is tragically foolish to hold firm to a spend-money-to-make-money conviction. The Feshbachs made poor spending decisions, continually leading a life of excess in the face of serious, known financial obstacles. At all times, their primary concern should have been reducing their substantial tax debt. But as their immoderate spending choices show, they were far more focused on living in the lap of luxury. They would have been wise to heed the proverb which cautions that *enough is better than too*

---

[207] *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) (quoting 11 U.S.C. § 105(a)).

[208] *Law*, 134 S. Ct. at 1194.

[209] *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

[210] *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554-55 (1915).

*much*. As it is, however, the Feshbachs' misjudgment ultimately cost them complete relief. Having concluded that the Feshbachs willfully attempted to evade their tax debt within the meaning of 11 U.S.C. § 523(a)(1)(C), the Court rules that such debt is nondischargeable. Accordingly, the Court will enter a separate final judgment in favor of the United States in this proceeding.